UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Case. No. 1:24-CR-00012-MRD |
| v. | |
| KYLE REYNOLDS | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Defendant Kyle Reynolds ("Defendant" or "Reynolds") moves to dismiss the three-count Indictment, arguing that it runs afoul of the Second Amendment to the Constitution. *See* D.'s Mot. (Dkt. No. 29). The indictment charges violations of 18 U.S.C. § 922(g)(1) (felon in possession), alleging that defendant unlawfully possessed a JTS 12-gauge shotgun (Count One), a Windham AR-15 (Count Two) and ammunition (Count Three). Because § 922(g)(1) comports with the Second Amendment to the United States Constitution, the motion should be denied.

As the analysis below demonstrates, even assuming *arguendo* that Defendant can claim the protection of the Second Amendment, the burden on those rights created by § 922(g)(1) is entirely consistent with the Nation's historical tradition of firearm regulation and therefore satisfies the Supreme Court's framework for decision. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Defendant's arguments to the contrary are unavailing and have been rejected by an overwhelming majority of courts.

1

## I.    BACKGROUND

### A.    Defendant's Criminal History

Defendant is a felon, previously convicted of Assault on a Person over 60 Years of Age.  *See* Exhibit 1 (Defendant's criminal history prepared by U.S. Probation Department).[1]

On March 30, 2007, at 24 years old, the Defendant made an initial appearance in Rhode Island's Second Division Court charged with Assault on a Person over 60, in violation of RIGL § 11-5-10. In pertinent part, the statute provides: "Any person who shall commit an assault and battery upon a person sixty (60) years of age or older, causing bodily injury, shall be deemed to have committed a felony."   On August 13, 2008, he pleaded guilty in Newport (RI) County Superior Court to a Criminal Information charging Assault on a Person over 60 and was sentenced to five years ACI, six months to serve and fifty-four months suspended sentence with probation.  *See id.*

### B.    Instant Offense

On April 3, 2024, a grand jury returned a Superseding Indictment charging Defendant with three counts of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Dkt. No. 15 (Superseding Indictment).  The ammunition possession arises from the January 23, 2024, execution of a search warrant at the Defendant's Middletown residence by agents from the Federal

---

[1] *See United States v. Williams*, 113 F.4th 637, 659-660 (6th Cir. 2024)("When evaluating a defendant's dangerousness, a court may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction. After all, nothing in the Second Amendment's text or history limits "dangerousness" to the particular felony (if any) listed in an indictment or plea agreement… Courts may consider any evidence of past convictions in the record, as well as other judicially noticeable information—such as prior convictions—when assessing a defendant's dangerousness.").

Bureau of Investigation.[2]  During the search, agents located and seized over 1000 rounds of ammunition suitable for use in rifles and shotguns.  The firearms charges stem from images the Defendant posted online coupled with statements from witnesses.

In February 2023, the FBI learned that about one year previously a Telegram user Kobra401k (later identified as the Defendant and referred to hereafter as 401K) made a series of concerning statements during online communications.[3]  Included among these were communications occurring in a Telegram chatroom "Nationalist Zulkarneyn Division" with user "DIEWITHAGRIN."  The Nationalist Zulkarneyn Division is a chat room comprised of international participants who primarily discuss and share neo-Nazi related ideological content. The communications with user DIEWITHAGRIN included the following:

- 401K: "Only when Our anger turns to hate will things finally change my brothers and sisters. Let it fuel your fire 🔥💪."

- DIEWITHAGRIN: "So when is it gonna change… Its been years… Where the fuck is the new tarrant[4]  or Breivik[5] … Where. [With a meme of 22 July 2011 Norway attacker Anders Breivik smiling.]"

---

[2] The search warrant, including the Affidavit supporting the Application for the warrant, are attached as Exhibit 2.

[3] Telegram describes itself as a messaging app with a focus on speed and security. Telegram groups can have up to 200,000 members. Telegram boasts that protecting users private conversations from snooping third parties, including "officials" is one of the two most important components of internet privacy. Telegram.org (last accessed July 14, 2025).

[4] Tarrant refers to Brenton Tarrant, the individual who conducted a mass shooting that killed 51 people in Christchurch, New Zealand in furtherance of his racially motivated violent extremist ideology on March 15, 2019.

[5]  Breivik refers to Anders Behring Breivik, the individual who killed 77 people in and around Oslo, Norway on in furtherance of his far-right violent extremist ideology on July 22, 2011.



Figure 1[6]

- 401K: "I hate. It fuels the raging inferno inside of me. I'm powered by hate and Jesus Christ. If you are of God, these things going on in the world should enrage you. This is not what God intended. Not how He wanted it to be. I know this. You haven't gotten to that point yet if you have to ask 'so when is it going to change."

- DIEWITHAGRIN: "Go do something… Too many words. [Image of what appears to be a sub-machine gun]… I have actions to back my beliefs…What about you?"

---

[6] Figure 1: Screenshot taken from Telegram chat room Nationalist Zulkarneyn Division of 401K and corresponding posts made on March 2, 2022.



Figure 2[7]

401K: "You are already outgunned. The fact you have to ask others on a telegram chat to 'do something' speaks volumes. You clearly aren't doing shit… These are my beliefs."

---

[7] Figure 2: Screenshot taken from Telegram chat room Nationalist Zulkarneyn Division of 401K and corresponding posts made on March 2, 2022.



Figure 3[8]

In Figure 3, the Defendant posting under the moniker 401K embedded two

photographs into the Nationalist Zulkarneyn Division chat room in response to

DIEWITHAGRIN. The first photo depicts a black long gun lying next to a Smith and

Wesson cardboard gun box. Upon review of this photo by agents, it was determined the

---

[8]   Figure 3: Screenshot taken from Telegram chat room Nationalist Zulkarneyn Division of 401K and corresponding posts made on March 2, 2022.

rifle is likely a semi-automatic Smith and Wesson Military and Police 15 Sport II rifle with an optic affixed to the top. The second photo depicts a long black knife laid across an open bible, with the butt of a different black firearm visible in the upper lefthand corner.

An additional post made by 401K in Telegram chatroom "/pol/-Politically Incorrect" alluded to the possession of ammunition:

• On February 6, 2023, 401k stated: "I have Ezekiel 6:3:47 written on all of my mags ✝💀."

On January 2, 2024, members of the Middletown (RI) Police Department (MPD) encountered the Defendant outside of his residence during a domestic dispute he was involved in with his then girlfriend. Upon further investigation of the altercation, MPD officers determined that there was no probable cause to believe a crime had occurred. After separating the parties, the girlfriend provided officers with a statement that the Defendant was in possession of a shotgun, an AK-47 rifle, a bandolier loaded with ammunition, and a vest fully loaded with magazines. One week later, during an interview with a FBI Special Agent, the girlfriend reiterated that the Defendant told her that he had an AK-47 rifle and brandished a black long gun in front of her on several different dates between September and December 2023. She also described seeing the Defendant in possession of ammunition at his residence. At the conclusion of the interview, the agent showed her the long black rifle seen in Figure 3 (above) to which she indicated that it looked very similar to the Defendant's purported AK-47.

In February 2024, a second witness described to the FBI his knowledge that the

Defendant possessed both ammunition and firearms at the time of the January 2, 2024, incident at his residence. This witness described providing a shotgun to the Defendant in 2021 and an AR-15 rifle to him in December 2022.[9]  The witness further described thereafter buying ammunition suitable for the weapons which he provided to the Defendant.  According to this witness, the Defendant maintained possession of the weapons from receipt until he returned them to the witness on or about January 15, 2024.  The witness turned over both the AR-15 and the shotgun to the FBI.  The witness and an agent from the FBI who each observed the AR-15 indicated that it appeared to be the same weapon partially visible in the bottom image of Figure 3.

## II.    LEGAL BACKGROUND

### A.    Standards for Decision

A defendant may seek the dismissal of an indictment on the ground that the statute on which the charge is based is unconstitutional.  *See, e.g., United States v. Fulcar*, 701 F. Supp. 3d 49, 51 (D. Mass. 2023).  When a defendant challenges the statute's constitutionality as applied to his particular circumstances, the district court may consider the challenge only if the government "'does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.'"  *United States v. Musso*, 914 F.3d 26, 29-30 (1st Cir. 2019) (citation omitted).

As indicated below, the government believes that Congress' categorical prohibitions are constitutional and that there is no need for a case-by-case consideration

---

[9] Both an AR-15 and an AK-47 are long-barreled rifles, which have semi-automatic or automatic capabilities.  The firearms bear some similarity in appearance.

of whether application of § 922(g)(1) to a particular defendant violates the Second Amendment. But if the nature of Reynolds' prior felony is relevant, then his motion to dismiss should be denied altogether because the facts of the prior conviction are either unknown or in dispute. Those facts appear relevant to the analysis of an as-applied challenge if one is deemed necessary. *See United States v. Betancourt*, 139 F.4th 480, 483-84 (5th Cir. 2025).

### B.    The Second Amendment & 18 U.S.C. § 922(g)(1)

The Second Amendment to the Constitution, which was ratified in 1791, provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

18 U.S.C. § 922(g), which codifies some of the criminal proscriptions on gun possession, prohibits nine classes of persons from possessing firearms or ammunition, including felons, unlawful users of controlled substances, those subject to domestic violence restraining orders, and those convicted on misdemeanor crimes of domestic violence. *See* 18 U.S.C. §§ 922(g)(1)-(9). The first federal statute disqualifying felons from possessing firearms was not enacted until 1938, and its proscriptions applied only to those convicted of violent offenses. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)(en banc). "The ban on possession [of firearms] by all felons was not enacted until 1961." *Id.* This ban, codified in subsection 922(g)(1), makes it is unlawful for any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to possess "a firearm or ammunition that has been

shipped or transported in interstate or foreign commerce."

### C.    *District of Columbia v. Heller, 554 U.S. 570 (2008)*

In 2008, the Supreme Court in *District of Columbia v. Heller* held that the Second Amendment protected the right of "law-abiding citizens" to possess handguns at home for traditionally lawful purposes, such as self-defense.  554 U.S. at 628-35.  The Court, in interpreting the Second Amendment, applied a two-step analysis.  The Court assessed first the "normal and ordinary" meaning of the Second Amendment's language and concluded that the amendment's operative clause "guarantee[d] the individual right to possess and carry weapons in case of confrontation."  *See id.* at 576, 592.  Second, the Court looked to the historical background of the amendment, as it "has always been widely understood that [it] codified a *pre-existing* right."  *Id* at 592.  In its review of pertinent history, the Court noted also that "like most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*  Moreover, the Court specified that "nothing in [the *Heller*] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons…."  *Id.*  The Court identified the prohibition of possession of firearms by felons "as a presumptively lawful regulatory measure" but specified that its opinion did not list all such measures.  *Id.* at 626 n. 26.

### D.    <u>First Circuit Precedent Applying *Heller*</u>

Following *Heller*, the First Circuit in *United States v. Rene E.*, 583 F.3d 8 (1st Cir.

2009), addressed the constitutionality 18 U.S.C. § 922(x)(2), which generally prohibits the possession of firearms by juveniles.  The Court noted that *Heller* "left intact" laws "prohibiting the possession of firearms by felons" as well as others such laws that were "similarly rooted in history."  *Rene E.* at 12.  The First Circuit ultimately held that Section 922(x)(2)'s prohibition was consistent with the Second Amendment, finding that there was a "longstanding practice of prohibiting" those "whose possession poses a particular danger to the public" from possessing firearms.  *Id.* at 15-16.

Next, the First Circuit in *United States v. Booker*, 644 F.3d 12 (1st Cir. 2010), addressed the constitutionality of 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by those who have been convicted of misdemeanor crimes of domestic violence.  The Court noted that *Heller* made clear that "the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons," and does not require restrictions be imposed on an "individualized, case-by-case basis." *Id.* at 23-24.  Accordingly, the First Circuit concluded that § 922(g)(9) was consistent with a non-exhaustive list of "presumptively lawful" bans, such as prohibiting felons from possessing firearms. *Id.* at 24.

Following *Heller*, *Rene E.*, and *Booker*, the First Circuit in *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011), addressed the constitutionality of 18 U.S.C. § 922(g)(1).  Appellant Torres-Rosario, who had two prior drug trafficking convictions, argued that § 922(g)(1) was unconstitutional as applied to him because he had not previously been convicted for a violent felony.  *Id.* at 113.  The Court noted that every circuit that had considered the constitutionality of the § 922(g)(1) post-*Heller* had

rejected blanket challenges to felon-in-possession laws. *Id*. The Court also noted that even if there were some felonies "so tame and technical as to be insufficient to justify" a ban on firearm possession, serious drug dealing, which is "notoriously linked to violence[,]" was not likely to be among them." *Id*. The Court held that § 922(g)(1) as applied to the appellant did not run afoul of the Second Amendment. *Id*.

###### E.     *Bruen* **and** *Rahimi*

Roughly a decade after *Booker* and *Torres-Rosario*, the Supreme Court decided *Bruen* and "made the constitutional standard endorsed in *Heller* more explicit." 597 U.S. at 31. To determine whether a government regulation infringes on the Second Amendment, courts must first determine whether the "Second Amendment's plain text covers the individual's conduct." *Id.* at 24. This first step of analysis "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. If the government demonstrates that a law regulates activity "falling outside the scope of the right as originally understood," the activity is not constitutionally protected. *Id.* at 18.

If the conduct falls within the Second Amendment's original scope (or if the evidence on this point is inconclusive), courts proceed to the second prong. There, the government is required to demonstrate affirmatively that a covered firearm regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. To determine whether a particular regulation is "consistent with the Nation's historical tradition of firearm regulation," courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a

comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631). Courts need not find a "historical *twin*." *Id.* at 30. Rather, courts should employ analogical reasoning to determine whether the government has identified "a well-established and representative historical *analogue*." *Id.* at 30 (emphasis in original). Courts must determine whether a historical regulation is a proper analogue for a modern regulation by determining whether the two regulations are "relatively similar," including "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (internal quotes omitted).

Applying this standard, the *Bruen* court invalidated a state licensing law that allowed an individual to obtain a license to openly carry a gun outside the home only after proving "proper cause exists." *Id.* at 12. The Court first found that the law fell within the Second Amendment's plain text because the petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 31-32. Next, the Court surveyed historical evidence from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the law squared with historical tradition." *Id.* at 34. "[N]ot all history is created equal," and the Court noted that evidence closer in time to the founding carries more weight." *Id.* Ultimately, the Court found that the government had not met its burden to identify an American tradition justifying this regulation. *See id.* at 69.

Approximately two years after *Bruen*, the Supreme Court once again confirmed that the historical analysis does not require a modern law to have a historical twin in *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The Court specified that the analogue

13

need only be "consistent with the *principles* that underpin our regulatory tradition." *Id.* at 704 (emphasis added). In her concurrence, Justice Barrett explained that broad principles supported by history and framed at the right "level of generality" may permissibly limit the Second Amendment's scope. *Id.* at 740. Although the statute before the Court in *Rahimi*, § 922(g)(8), "[was] by no means identical to these founding era regimes," it did "not need to be" because it "[fit] neatly within the tradition the surety and going armed laws represent." *Id.* at 698.

**F.    First Circuit and Its District Courts' Application of *Bruen* and *Rahimi*.**

Following *Bruen* and *Rahimi*, courts in the First Circuit have continued to uphold the constitutionality of regulations restricting the possession of firearms by non-law-abiding citizens. Furthermore, these courts have found that "the constitutionality of § 922(g)(1) was not 'unmistakably ... cast into disrepute by' *Bruen*." *See United States v. Johnson*, No. 23-10043, 2024 WL 199885 *2 (D. Mass. Jan. 18, 2024) (citing *United States v. Fulcar*, No. 23-10053, 2023 WL 7116738 *4 (D. Mass. Oct. 27, 2023)). Such prohibitions remain "consistent with the Nation's historical tradition of . . . disarming unvirtuous or dangerous citizens." *Id*.

Courts in the First Circuit have remained unconvinced by challenges that seek to minimize the severity of a defendant's prior gun possession felonies as "so tame and technical as to be insufficient to justify the ban." *Id.* at *4 (citing *Torres-Rosario,* 658 F.3d at 113). The First Circuit maintains, even following *Bruen*, that "[n]o case from the Supreme Court or [the First Circuit] holds that § 922(g)(1) is unconstitutional in any of its applications[.]" *United States v. Langston*, 110 F.4th 408, 419 (1st Cir. 2024).

14

Additionally, the First Circuit has specified that *Heller*, *Bruen*, and *Rahimi* "consistently reiterate . . . the presumptive lawfulness of the felon-in-possession statute." *Id.* at 419-20 ("[T]he Supreme Court has stated repeatedly over sixteen years, from *Heller* to *Rahimi*, that felon-in-possession laws are presumptively lawful.").

In *United States v. Worster*, 765 F.Supp.3d 112, 124 (D.R.I. 2025), Judge McConnell reiterated that "[n]either *Bruen* nor *Rahimi* reversed binding First Circuit precedent (*Torres-Rosario*) affirming the constitutionality of § 922(g)(1)." Judge McConnell noted that *Torres-Rosario* left open the possibility of as-applied challenges to § 922(g)(1) in those limited cases where "the underlying felony is so tame and technical as to be insufficient to justify the ban." *Id.* In the single instance cited in *Worster* where a circuit invalidated § 922(g)(1) as applied, the challenger was "only 'convicted of food-stamp fraud' nearly thirty years prior." *Id* (internal citation omitted). Of course, Reynolds' predicate offense—assault and battery – stands on far different footing than food-stamp fraud. *See United States v. Schnur*, 132 F.4th 863, 870 (5th Cir. 2025) (given that person convicted of car theft may be constitutionally dispossessed of firearm under *Bruen*'s historical framework, it stands to reason that a person convicted of aggravated battery can be dispossessed as well).

## III.    ARGUMENT

Defendant erroneously asserts that § 922(g)(1) is unconstitutional because it fails to meet the *Bruen* standard. Under *Bruen's* two-step analysis, the regulation does not run afoul of the Second Amendment. First, the conduct described in § 922(g)(1) falls outside the scope of the Second Amendment's right to bear arms. Second, even if the

conduct was protected by the Second Amendment, this Nation's longstanding historical tradition of firearm regulation support the regulation.

> A.    **The Supreme Court has repeatedly affirmed that it does not violate the Second Amendment to disarm convicted felons.**

The *Heller* Court expressly contemplated that certain citizens could be "disqualified" from keeping or bearing arms under the Second Amendment.  *See id.* at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.").  The Court also observed that laws, such as felon in possession laws, are "presumptively lawful" and fall within "exceptions" to the Second Amendment's protections.  *Id*. at 627 n.26, 635 (providing a non-exhaustive list of "presumptively lawful regulatory measures.").  The Court further stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 626.  A plurality of the court reiterated these points in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010), noting that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms *by felons*.'" (emphasis added); *see also Bruen*, 597 U.S. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional); *Rahimi*, 602 U.S. at 699 (reasserting the presumptive lawfulness of prohibitions of firearms by felons); *see also Langston*, 110 F.4th at 419-20.

> B.    **The overwhelming majority of cases do not distinguish**

> between whether defendant's prior conviction is "violent"
> or "nonviolent."

Defendant's argument—that the felon-in-possession statute is incorrectly applied to him because his felony is "non-violent"—is not supported by case law either before,[10] or after,[11] *Bruen*.  In *Zherka*, the Second Circuit considered and rejected using the crime of violence definition from the Armed Career Criminal Act to distinguish between violent and nonviolent crimes in the Second Amendment context.[12] 140 F.4th at 95.  The court described that approach as having "proven largely unworkable" and "not rooted in the text of the Second Amendment." *Id.*  (cleaned up).  As such, the status of Defendant's prior convictions as "violent" or otherwise are not pertinent to the calculus under *Bruen*.  *See id.* at 94-95; *see also id.* at 96 ("[W]e join the majority of our sister circuits . . . and reject Zherka's contention that the prohibition on possession of firearms by convicted felons violates the Second Amendment as applied to 'nonviolent' felons.").

---

[10] *Folajtar v. Attorney General,* 980 F.3d 897, 901 (3rd Cir. 2020) (prior conviction for federal tax fraud); *United States v Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (reaffirming the Fifth Circuit's pre-*Heller* holding "that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate the Second Amendment).

[11] *See e.g., Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025) (rejecting challenge to § 922(g)(1) where predicate felony was conviction for conspiracy to make false statements); *United States v. Duarte*, 137 F.4th 743, 761 (9th Cir. 2025)(finding that § 922(g)(1) applies to non-violent felons); *Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025), *petition for cert. filed*, May 12, 2025 (No. 24-1155)(Second Amendment does not prevent application of § 922(g)(1) to nonviolent offenders); *United States v. Hunt*, 123 F.4th 697, 700 (4th Cir. 2024)(upholding constitutionality of § 922(g)(1) and rejecting "felony by felony litigation" of its constitutionality); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024)(rejecting § 922(g) challenge to "nonviolent" prior convictions and concluding there is no need for "felony by felony litigation regarding the constitutionality of § 922(g)(1)"); *United States v. Hester*, 2024 WL 4100901 at *1 (11th Cir. 2024)(per curiam)(finding that *Bruen* and *Rahimi* did not upend circuit precedent which held § 922(g)(1) disqualifies felons from possessing firearms under "any and all circumstances"); *United States v. Alvarado*, 95 F.4th 1047 (6th Cir. 2024) (rejecting claim that § 922(g)(1) was unconstitutional where prior convictions were for non-violent DUI and misdemeanor possession);

[12] The Defendant proposes that the Defendant's conviction for Assault on a Person Sixty Years or Older does not qualify as a crime of violence under the Armed Career Criminal Act definition. D. Mot. At 14. Neither the Supreme Court nor the First Circuit have applied the ACCA definition in the Second Amendment context.

More generally, since *Bruen*, district courts in every jurisdiction as well as at least eight Circuit Courts of Appeals, including the First Circuit, have heard rejected challenges to the constitutionality of § 922(g)(1).[13]

### C.    Section 922(g)(1) is consistent with the Nation's longstanding tradition of firearm regulation.

The application of § 922(g)(1) to Reynolds is constitutional because it is consistent with the Nation's longstanding traditions.  In analyzing tradition, courts consider "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions.  *See Bruen*, 597 U.S. at 27-28.  In *Rahimi*, the Court reiterated that the regulation need only be consistent with the *principles* that underpin the Nation's regulatory tradition.  602 U.S. at 692.  The Court rejected the premise that the scope of firearms regulation is fixed by the laws that existed at and around the founding of the Nation. *See id.* at 691.  In other words, while certain firearms regulations may have a direct "twin" that existed at the founding, others may "require a more nuanced approach." *Bruen*, 597 U.S. at 27.

Though subject to several iterations over the years, the whole of § 922(g) has reflected Congress's longstanding recognition that the "ease with which" firearms could be acquired by "*criminals,* . . .  and others whose possession of firearms is [] contrary to the public interest" is "a matter of serious national concern."  S. Rep. No. 90-1097, at 2114 (1968) (emphasis added); *see also Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding that the legislative history of these statutes supports the view that

---

[13] A list of these cases can be provided to the Court.

Congress sought to disarm those who may not be trusted to possess a firearm); *Barrett v. United States*, 423 U.S. 212, 220 (1976) (explaining that the "principal purpose" of federal gun control legislation was "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency"); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (same).

Consistent with that purpose, many historical analogues support the restriction of firearm ownership by felons as presumptively risky individuals. Under *Bruen*'s framework, historical analogues to § 922(g)(1) are considered "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. In general, § 922(g)(1) criminalizes the possession of firearms by a specific class of people who are, by definition, not law-abiding citizens. As explained by the Seventh Circuit in *United States v. Yancey*, "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." 621 F.3d 681, 683 (7th Cir. 2010) (citing *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983)).[14] Due to the willingness of felons to engage in unlawful activity, § 922(g) identifies this group as being "presumptively risky" and unfit to possess firearms. *Yancey*, 621 F.3d at 683. Indeed, the Second Circuit observed in *Zherka* that,

---

[14] *Worster* rejected the government's reliance on on *Yancey* because that case was decided before *Bruen*. *Worster*, 765 F. Supp. 3d at 125-26. But although *Yancey* predated *Bruen*, *Yancey* relied on the history-and-tradition test that *Bruen* approved, not on the levels-of-scrutiny approach that *Bruen* rejected. *See Yancey*, 621 F.3d at 683-686 (drawing analogies to historical laws imposing categorical restrictions). District courts in the Seventh Circuit have accordingly continued to follow *Yancey* even after *Bruen*. *See, e.g.*, *United States* v. *Swiger*, No. 22-cr-38, 2024 WL 4651054, at *3 (N.D. Ind. Nov. 1, 2024); *United States* v. *Holcomb*, No. 24-cr-15, 2024 WL 4710612, at *10-12 (E.D. Wis. Aug. 22, 2024); *United States* v. *Overholser*, No. 22-cr-35, 2023 WL 4145343, at *2 (N.D. Ind. June 23, 2023); *United States* v. *Posey*, 655 F. Supp. 3d 762, 773 (N.D. Ind. 2023).

"[b]ecause history reveals a tradition of categorical legislative bans on firearms possession by classes of people perceived as dangerous, a prohibition directed at persons convicted of serious crimes is among the easiest classifications to justify." 140 F.4th at 93.

Legislatures have historically been given the authority "to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019)(Barrett, J., dissenting); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272 (2020) (observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed").

Pennsylvania's pre-ratification legislature provides one such example. "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *Skoien*, 614 F.3d at 640. This address notes that "the people have a right to bear arms for the defense of themselves and their own state . . . and no law shall be passed for disarming the people or any of them, *unless for crimes committed or real danger of public injury from individuals*." *Id.* (quoting Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). The address's proposal contemplated prohibiting individuals convicted of crimes or others who were presumably risky from possessing weapons.

Historical principles supporting these prohibitions date back to the ratification of the Constitution. During the Massachusetts Convention, Samuel Adams proposed an

amendment which would prevent Congress from "[barring] the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights*, 674-675, 681 (emphasis added). Many other states, "whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of a crime." *Skoien*, 614 F.3d at 640. These approaches illustrate the position that "felons were not historically understood to have Second Amendment rights." *Kanter*, 919 F.3d at 445 (7th Cir. 2019).

Additionally, restricting a felon's right to bear arms is analogous to several civic rights that have historically been subject to forfeiture by individuals convicted of crimes, such as the right to vote and the right to serve on a jury. *See Johnson*, 2024 WL 199885, at *3-4 (citations omitted). As stated by the *Johnson* court, such "historical precursors" are "analogous enough [for § 922(g)(1)] to pass constitutional muster" under *Bruen*. *See Johnson*, 2024 WL 199885 at *4.[15]

As the Ninth Circuit held en banc in *Duarte*, the severe punishments historically applicable to even nonviolent offenses are evidence of a longstanding tradition that legislatures could permanently disarm those who committed such crimes. *See* 137 F.4th at 756-59. The Ninth Circuit further pointed out that § 922(g)(1) is fully consistent with

---

[15] Scholars concur with the conclusion that prohibiting the possession of firearms by individuals the legislature deemed to be dangerous, including felons, is supported by history. *See, e.g.*, Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U. L. REV. 1187, 1239 (2015) ("[H]istory suggests that when the legislature restricts the possession of firearms by discrete classes of individuals reasonably regarded as posing an elevated risk for firearms violence, prophylactic regulations of this character should be sustained."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* <u>District of Columbia v. Heller</u> *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009) (citing historical examples for the proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'").

the historical tradition of disarming categories of persons that a legislature believes to present a special danger of misuse of firearms.  *Id.* at 759-61.  In the Ninth Circuit's view, whether taken separately or in combination (as *Rahimi* permits), these two strands of historical tradition supported categorical application of § 922(g)(1) to both violent and nonviolent felonies without the need for individual case-by-case consideration.  *Id.* at 755 & n.9.

*Zherka* explains that the same analysis applies to convictions for nonviolent as well as violent felonies because both violent and nonviolent felony convictions represent a violation of basic terms of society's social contract.  140 F.4th at 94.  The conduct on which all felony convictions are based "is reasonably regarded as an indication that such a person lacks the 'character of temperament necessary to be entrusted with a weapon."  *Id.* (quoting *Bruen*, 597 U.S. at 13 n.1).  As such, contrary to Defendant's contentions, the historical record justifies the restriction of gun possession by felons.

**D.    Restoration of Second Amendment rights**

Finally, Reynolds contends that the permanent nature of the possessory ban created in § 922(g)(1) unduly burdens his Second Amendment rights.  D. Mot. at 16 ("the disarmament of Mr. Reynolds is essentially permanent").  Reynolds has apparently overlooked the steps the Attorney General recently took to expand a defendant's ability to have those rights restored if circumstances warrant.  Under 18 U.S.C. § 925(c), a person may apply to the Attorney General for relief from federal firearms disabilities.  *See id.*  The Attorney General may grant relief if the applicant

22

shows that "the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety," and if "the granting of the relief would not be contrary to the public interest." *Id.* If the Attorney General denies relief, the applicant may seek judicial review in federal district court. *See id.*

The program instituted by § 925(c) was effectively disabled between 1992 and 2025 because Congress had delegated the authority to grant relief to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); appropriations statutes during those years included provisos barring ATF from using funds to act on § 925(c) applications. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *United States v. Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012). Recognizing that the appropriations bar applies only to ATF, however, the Attorney General recently revitalized the § 925(c) process by withdrawing the delegation of authority to ATF. See *Withdrawing the Attorney General's Delegation of Authority*, 90 Fed. Reg. 13,080 (Mar. 20, 2025). An individual who seeks an exception to one of § 922(g)'s categorical restrictions could invoke that process and, if the Attorney General denies his application, seek judicial review.

The § 925(c) process provides a more workable mechanism for granting exceptions than a court-administered regime of as-applied challenges brought by those engaged in criminal conduct. *See Zherka*, 140 F.4th at 94-95 & n.64. Both the Attorney General and, if necessary, a district court reviewing the Attorney General's decision, could decide based on Reynolds' current as well as past conduct whether restoration of his right to bear arms would be inimical to public safety. By contrast, Reynolds'

suggestion that the better alternative is to refuse to apply the § 922(g)(1) ban to him in the first place enjoys no support in law or policy and should be rejected out of hand.

## IV.    CONCLUSION

At the time that the Defendant possessed the firearms and ammunition described in the Indictment, he had been previously convicted of assaulting a person sixty years of age or older, causing bodily injury.  He was prohibited from possessing a firearm or ammunition and that prohibition did not violate his Second Amendment rights. For the reasons set forth in the government's Response, the Defendant's motion to dismiss should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorney,

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Paul F. Daly, Jr.*
PAUL F. DALY, JR.
Assistant U.S. Attorney
U.S. Attorney's Office
One Financial Plaza, 17th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
paul.daly@usdoj.gov

## CERTIFICATE OF SERVICE

On this 14th day of July 2025, I filed the above motion using the Court's electronic filing system and thereby made the motion available to defense counsel of record.

/s/ Paul F. Daly, Jr.
Paul F. Daly, Jr.